UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 16 CR 590 |
| v. | ) | |
| | ) | Judge Gary Feinerman |
| MARCO PROANO | ) | |

**GOVERNMENT'S SUPPLEMENTAL FILING IN SUPPORT OF ITS
RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

# EXHIBIT A

IN RE:   GRAND JURY       )      GRAND JURY NO.

         INVESTIGATION   )        15 GJ 327


BEFORE THE FEDERAL GRAND JURY

(Special August 2015 Grand Jury)


August 25, 2016

12:30 p.m.


PRESENT:

                THE HONORABLE ZACHARY T. FARDON
                United States Attorney, by,
                MS. GEORGIA ALEXAKIS
                MS. ERIKA CSICSILA
                Assistant United States Attorneys
                Chicago, Illinois


                (The Grand Jury, having convened

                at 12:30 p.m. on the 25th day of

                August 2016, pursuant to

                adjournment, met in closed session

                and the following proceedings were

                had herein.)

PATRICK CAMDEN,

having entered the Grand Jury Room, was sworn by the

Foreperson as follows:

THE FOREPERSON:  Do you

solemnly swear or affirm that the

testimony you're about to give is

the truth, the whole truth, and

nothing but the truth, so help you

God?

THE WITNESS:  I do.

THE FOREPERSON:  Please be

seated.

(Whereupon, the witness was

sworn.)

EXAMINATION

BY MS. ALEXAKIS:

Q    Could you please state and spell your name,

for the record?

A    Patrick Camden, C-a-m-d-e-n.

Q    Mr. Camden, you received a subpoena to

testify today, correct, your attorney did?

A    My attorney did, yes.

Q    And before we begin, I want to make sure that

you understand what rights you have regarding this

PATRICK CAMDEN                                    3

Grand Jury proceeding. You understand that this
Grand Jury is investigating a possible violation into
federal criminal law, correct?

    A    Yes, ma'am.

    Q    You understand that you have been placed
under oath, correct?

    A    Yes, ma'am.

    Q    So you understand that -- and you understand
that all of these proceedings are being transcribed
by the court reporter in front of you?

    A    Yes, ma'am.

    Q    You have an attorney who has represented you
in connection with these proceedings, correct?

    A    That's correct.

    Q    That's Jennifer Russell?

    A    Yes, ma'am.

    Q    You understand that while Miss Russell can't
be in the room with you while you're testifying, if
you want to confer with her at any point during your
testimony, the Grand Jury will give you a reasonable
opportunity to do that, correct?

    A    Yes, ma'am.

    Q    You understand that you have a Fifth
Amendment right regarding these proceedings, meaning

PATRICK CAMDEN                                    4

that if I ask you a question and you feel that an

honest answer to that question would incriminate you,

you have a right not to answer that question?

    A    Yes, ma'am.

    Q    And you understand that if you do make any

false statements, that those statements could be used

against you in a later investigation or charges

against you, for example, for perjury?

    A    Yes, ma'am.

    Q    Mr. Camden, you are currently a spokesperson

for the Fraternal Order of Police, correct?

    A    Yes, ma'am.

    Q    And the Fraternal Order of Police is a union

for police officers?

    A    That is correct.

    Q    It's often referred to as FOP for short,

correct?

    A    Yes, ma'am.

    Q    How long have you been the spokesperson for

FOP?

    A    Since April of 2011.

    Q    And what are your responsibilities as an FOP

spokesperson?

    A    Primarily responding to police involved

PATRICK CAMDEN                    5

shootings, to be able to talk to the media giving

them the basic very preliminary facts of what took

place at the shooting.

    Q    Do you have an estimate as to the number of

police involved shootings that you have covered as an

FOP spokesperson?

    A    It has to be around 100, 150, somewhere in

that area.

    Q    So this is since April of 2011?

    A    Yes, ma'am.

    Q    You're paid by the FOP on a contract basis,

correct?

    A    That's correct.

    Q    So there is a monthly amount that you're paid

that you and FOP have agreed to?

    A    That is correct.

    Q    You were formerly an officer with the Chicago

Police Department, correct?

    A    Yes, ma'am.

    Q    How long were you an officer?

    A    Twenty-nine years and a day.

    Q    And while you were with Chicago Police

Department, you for some period of time served as the

deputy director of media relations with CPD, correct?

A      Yes, ma'am.

Q      How long were you in that role?

A      Ten years.

Q      Do you have an estimate as to the number of shootings, police officer involved shootings, that you had to cover when you were a deputy director of media relations?

A      Approximately 350.

Q      And you have a number of friends, I assume, who work for CPD?

A      Yes, ma'am.

Q      Do you have family members who have worked or work for CPD?

A      No, ma'am.

Q      Anyone else in your family ever work for CPD?

A      No, ma'am.

Q      As deputy director of media relations with CPD, you spoke with the press, correct?

A      That is correct.

Q      And who is it within CPD that currently has the responsibility to speak with the press?  You don't need to name a name.

A      It would be somebody from news affairs or -- it's changing on a pretty regular basis.  I don't

know if there's one defined person that does.

Q     Why does FOP have a spokesperson?

A     To be able to give the very preliminary facts of an officer involved shooting at the time of the shooting.

Q     Why does FOP have a spokesperson if CPD is also issuing statements to the media or answering questions from the media?

A     CPD's statements come out about four or five hours after the shooting and with social media, you have to be able to get out the basic facts early.

Q     And when you say the CPD statements come out four to five hours after a shooting, that's generally?

A     Generally, yes.

Q     So FOP from your perspective is more responsive, quicker?

A     Yes, ma'am.

Q     And is it fair to say that FOP wants a spokesperson so that the spokesperson is telling the story from the officer's perspective?

A     That would be correct, yes, ma'am.

Q     How are you typically notified of a police involved shooting?

A     A phone call from the union rep that's
working that day.

Q     And what are you typically told during those
phone calls?

A     Location of the shooting, obviously there is
an officer involved shooting, the location and who
the rep was.  I would be told that.

Q     And then you go to the scene of the shooting?

A     Yes.

Q     How long does it typically take you to get to
the scene of the shooting?  I know the answer will
depend on where the shooting is.

A     Yes.

Q     Is it fair to say that you try to get to the
shooting, the scene of the shooting, as quickly as
possible?

A     Yes, yes, I do.

Q     Who do you typically talk to when you arrive
at the scene of the shooting?

A     The union rep that's working on the shooting.

Q     When you say union rep, that's synonymous
with an FOP field rep?

A     Yes, ma'am.  I'm sorry.

Q     How many field reps are there, union

representatives, at a scene typically?

 A  Typically it would be one.

 Q  And what do you talk to the field rep about?

 A  Generally he would give me a rundown of the basic facts of what took place.

 Q  What is your understanding where the FOP field rep gets that information?

 A  It's either from talking to the officer, if he did, or talking to the people investigating the shooting at that point in time.

 Q  Do you ever talk to the officer who did the shooting?

 A  Never.

 Q  Do you ever talk to any other officers who saw the shooting?

 A  If I did, it would be cordially, it wouldn't be anything about the shooting.

 Q  Cordially meaning?

 A  Just, hey, how are you.

 Q  Have you ever spoken to victims of the shooting?

 A  No, ma'am.

 Q  Detectives or any other officers who are investigating the shooting?

A       Regarding the shooting, no, ma'am.

Q       Do you talk to any witnesses, non-law
enforcement witnesses, who may have seen the
shooting?

A       No, ma'am.

Q       How long do you typically spend gathering
information about the shooting?

A       Generally it would be about an hour.

Q       And then you prepare a statement based on the
information that you've gathered?

A       That's correct.

Q       And that's the statement that you end up
giving to the press?

A       That's correct.

Q       When you give the statement to the press, do
you also answer any follow-up questions from the
press?

A       Depending on the questions.

Q       What do you mean by that?

A       They could ask a question that I didn't have
the answer to and I would tell them I don't know.
They would have to follow-up with news affairs.

Q       Do you provide updates to the press after
your initial statement?

A    No, ma'am.

Q    Have you ever amended a statement as an FOP spokesperson after you learned new information about the shooting?

A    No, ma'am.

Q    So is it fair to say that you give one statement as quickly as possible as you can after the shooting based on what the FOP field rep tells you and that's the end of your involvement?

A    That's correct.

Q    So let's talk about an officer involved shooting that took place on December 22nd, 2013.  You went to the scene of that shooting, correct?

A    That is correct.

Q    Do you have any recollection as to what time you arrived?

A    No, ma'am, I don't.

Q    Do you have any recollection as to who was there when you arrived?

A    I'm making the assumption it was a field rep from FOP.

Q    You don't remember who that field rep was?

A    No, ma'am.

Q    Based on your practice though, you would have

PATRICK CAMDEN                                    12

spoken to the FOP field rep, correct?

A    Absolutely.

Q    Do you remember what the FOP field rep told
you at that time?

A    I have no independent recollection of that
shooting.  I obviously saw the clip, the newspaper
clip that you presented to me.  Aside from that, no,
ma'am.

Q    And you're referring to a news article that I
showed you just a little bit ago before you came in
to testify before the Grand Jury?

A    That's correct.

Q    I'll show you that news article in a few
minutes and we can talk about that more.  So you
don't have any recollection of speaking with Officer
Marco Proano, the officer who did the shooting in
this case?

A    No, I wouldn't talk to the officer involved
in the shooting.

Q    And you didn't speak to any of his fellow
officers who saw the shooting?

A    No, ma'am.

Q    Okay.  Did you make any notes related to the
shooting?

A    Other than on an invoice that I sent in at the end of that month documenting the shooting time and location, no, I keep no records of it.

Q    And that's an invoice you provide to FOP so they can pay you?

A    Yes, ma'am.

Q    So as you're gathering information or talking to the FOP field rep, you're not jotting down any notes that you're then going to use to formulate your statement?

A    No.

Q    So this is a little off the cuff?

A    Very much so.

Q    All right.  So I would like to show you what's been marked as Grand Jury Exhibit Camden. It's a two-page document printed out from the web, a news article published by CBS Chicago on December 22nd, 2013.  Do you have that in front of you, Mr. Camden?

A    Yes, ma'am.

Q    And you see on the first page of the statement sort of in the middle -- I'm sorry -- the first page of the article in the middle of the page it says -- the headline says, "Two teens shot by

police in Roseland."  Do you see that?

    A    Yes, ma'am.

    Q    And Roseland is the neighborhood where the shooting took place, correct?

    A    Correct.

    Q    And then it says December 22nd, 2013, 5:50 p.m., correct?

    A    Correct.

    Q    And is it your understanding that the shooting took place a little bit after 5 o'clock that evening?

    A    I don't know exactly.  I would assume that's the case based on what I'm looking at.

    Q    Okay.  You're right because the article -- the second paragraph of the article reads, "About 5:00 p.m. police pulled over a speeding stolen car near 95th and LaSalle, according to a statement from the news affairs office."  Do you see that?

    A    Yes, ma'am.

    Q    And news affairs, that's situated at CPD, correct?

    A    That's correct.

    Q    And the second -- or I'm sorry -- the third paragraph goes on to say, "After the car stopped, the

driver got out of the car and ran away," according to
the statement, correct?

    A    I'm assuming that's the case, yes, ma'am.

    Q    Right, and that's the statement from news
affairs.  I'm going to turn to the second page of
this exhibit and I'm going to read the first full
paragraph on the page.  It says, "Fraternal Order of
Police spokesman Pat Camden's narrative of the
incident was different than the news affairs
statement.  He said there were seven people in the
car and after the car stopped, a passenger got out
through the rear driver side door.  The driver backed
up and hit the passenger.  Officers then began
walking up to the car telling the driver to stop, but
the car began to pull away dragging the passenger
Camden said."  Do you see that?

    A    Yes, ma'am.

    Q    And then I'll read the next paragraph as
well.  It says, "Concerned with the safety of the
person being dragged, officers opened fire on the car
striking two teens inside.  Camden said the teens'
injuries were not thought to be life-threatening.
Camden also said a replica weapon was found in the
vehicle."  Do you see that?

A    Yes, ma'am.

Q    Do you have any recollection of making these statements?

A    Independent recollection, no, ma'am. Obviously I did.  That's what CBS is reporting.

Q    Do you know why your statement of what happened that night would have differed from the statement given by news affairs?

A    This was a statement that's paraphrased from what I said that they had on camera.  So a producer or an editor is rewriting the statement.  Why it's different, I couldn't tell you.  That's the information I was given at the time that I was on the scene that I gave to the media.

Q    So you don't have any independent knowledge of the version of events reflected in this article?

A    That's correct.

Q    Okay.  So you don't actually know that a passenger tried to get out through the rear door, correct?

A    I wasn't on the scene to see that, no.

Q    And you don't actually know that a driver hit -- the driver of the vehicle hit a passenger, correct?

A    No, ma'am.

Q    You have no reason -- you don't have any knowledge, personal knowledge, that the officers told the driver of the vehicle to stop?

A    That's correct.

Q    You don't have any personal knowledge that the driver dragged a passenger?

A    That is correct.

Q    And you don't have any personal knowledge that a replica weapon was found inside the car?

A    That's also correct.

Q    Did you know that there is a video of the shooting?

A    No, I didn't.

Q    So it's fair to say then that you've never watched the video?

A    That is correct.

Q    Have you ever gone to a shooting where based on what you learned that night you thought the shooting wasn't justified?

A    Not that I can recall, no, ma'am.  Not within the parameters of working for FOP.

Q    Have you ever refused to comment to the media?

PATRICK CAMDEN                                    18

A    No, ma'am.

Q    Following an officer involved shooting?

A    No, ma'am.

Q    I don't have any other questions for you, Mr. Camden.

                    MS. ALEXAKIS:  Do any of the
                Grand Jurors?

BY A GRAND JUROR:

Q    Mr. Camden, I have a couple questions for you.  First of all, when you make a statement to the media or public or whomever it might be, do you make this notation that you are only speaking on behalf of what you understand what happened, you make it clear that you're not investigating the incident or anything, you're just kind of relaying information that was given to you?

A    That's a very good question, sir.  I do.  At the beginning of any statement I ever gave the media, that what I was telling them is based on very basic facts that were given to me by another individual at this point in time.  You never see that in print, you never see that on TV because that was the disclaimer.

Q    So you do have that.  The second question is: You said you get your facts from the field rep that

was attending before you got there?

    A    Right.

    Q    Once you prepare your statement that's about
to go in front of the cameras or whatever,
microphones, do you double-check with this rep again
to make sure that you guys have it right or do you
just rely on him telling you once?

    A    Generally if there was a question about the
time or what hospital they took the offender to or an
incident I wasn't sure of, I would talk to him again,
but in most cases it was pretty well settled after
our initial conversation.

    Q    So you can trust yourself that you wrote down
whatever you're about to say as he told it to you,
you're not omitting anything or adding anything?

    A    That's correct, sir.

BY MS. ALEXAKIS:

    Q    To be clear.  You testified earlier that you
don't actually write anything down?

    A    That's correct.

    Q    And for this particular shooting, do you have
any recollection as to how many times you had spoken
to the FOP field rep before you answered questions
from the press or made any statements?

A    No, ma'am.  I couldn't swear to it, no.

BY ANOTHER GRAND JUROR:

Q    Mr. Camden, as the spokesperson for the FOP,
is it your -- how do I say it?  Are you there to give
a good light to the FOP?

A    To be very honest with you, sir, I'm there to
give a good light to the officer that's involved in
the shooting.  As a police officer for 40 years, I
have never met anybody, any police officer that woke
up in the morning and said I was going to go out and
shoot somebody.  It's a very traumatic situation for
the officer and I feel the officer deserves -- before
social media castigates him, I feel the officer needs
at least to get the basics of the shooting out.

BY ANOTHER GRAND JUROR:

Q    I would imagine most of these scenes are
pretty chaotic.  How often do you find out after
you've given your statement that some of the
information that you got wasn't accurate just because
of the craziness of what might be going on at that
moment?

A    Generally I would get there -- again,
depending on the location and the time of the
shooting, by the time I would get there, most of the

chaos was settled down.  If it was still going on, we
would move to a different location so we didn't start
it all up again.  Your question on finding out about
something after the fact, I can't remember an
instance with the FOP where that happened.

Q    You feel like most of the time the stuff --
the information you're given at the time doesn't
change later on, that there would be that -- you say
you don't ever amend your statements or go back and
fill in holes or clarify.  So you feel like when you
leave the scene, whatever statement you give to the
press is usually pretty accurate then?

A    Again, putting out the disclaimer on the
front end that it's very basic, preliminary
information, yes, ma'am.

BY MS. ALEXAKIS:

Q    But you don't follow-up to find out?

A    No, ma'am.

BY ANOTHER GRAND JUROR:

Q    So that I can understand.  Your job is
primarily to give one statement on any given officer
shooting involvement?

A    Yes, ma'am.

Q    Okay.  You're not there to do any more

follow-up, that's not your job, it's just to give the
first basic statement?

    A    When the media would call asking about
follow-up questions, I would refer them to news
affairs because the police department was doing the
investigation, not the union.

BY ANOTHER GRAND JUROR:

    Q    What is your expectation on how much the
field agent would know about the shooting?  My
understanding is the field agent would talk to the
shooter and I would think would get there before you.
Is his job to give you a lot of details on what
happened or at least everything he knows?

    A    I would refer to what I would say is the
Reader's Digest version.  Again, giving the media the
basics of what happened.  The field rep would do the
same for me, just the very preliminary facts of what
took place.

    Q    So the field rep should probably know a more
detailed description of what happened and then give
you the highlights?

    A    To be honest with you, sir, not necessarily.
Again, depending on the situation, depending on the
totality of the circumstances, some of them can be

very complicated.  The media is a little inpatient at
times, social media has no patience.

BY ANOTHER GRAND JUROR:

    Q    When you've gone back and, let's say, seen an
article like this related to an incident that you've
been recorded on, have you obviously been misquoted
or the information that you provided that you can
remember been totally false or incorrect or whatever?

    A    Well, a lot of times, as in this article, it
gets paraphrased, you know, it's not a direct quote.
Part of the reason for talking to the media, and I
will go back to my days with CPD, is the producers
looking at the video of what I said would be able to
get the same facts out to the public versus trying to
piece together what's on social media or hearsay.

    Q    Do you have any liability in the situation as
representing the FOP and being the spokesperson for
them in making these statements?

    A    I guess because I'm sitting here I would say,
yes, I do.

BY ANOTHER GRAND JUROR:

    Q    Can I ask you:  You are a spokesperson at a
shooting where an officer's discharged his weapon.
Are you also on the scene when an officer is shot, do

you represent both sides of that?

    A    I would be, I have been.  Generally when an officer was shot I would be at the scene, but I generally would leave the statements to the superintendent of police because at that point he's going to talk to the media.

                MS. ALEXAKIS:  Are there any other questions for Mr. Camden?  Not seeing any, I would ask that the witness be excused.

                THE FOREPERSON:  Thank you very much.

                (WHEREUPON there being no questions by the Grand Jurors, the witness was excused.)

PATRICK CAMDEN                                    25

```
IN RE:    GRAND JURY      )     Case No.
          INVESTIGATION   )     15 GJ 327
```

C E R T I F I C A T E

    I, MELISSA A. HILL, CSR, do hereby certify that I reported the proceedings had in the above matter before the Federal Grand Jury in the Grand Jury Room in the United States Court House at Chicago, Illinois, on the 25th day of August, 2016, and that the foregoing is a true and accurate transcript of said proceedings.

Melissa A. Hill, CSR

9.13.16


GRAND JURY EXHIBIT
CAMDEN
82

Chicago    SIGN UP FOR NEWSLETTERS                    CBS Local Rewards   2   Log In   Register   Search

CBS Chicago
02 WBBM

HOME   NEWS   SPORTS   HEALTH   AUDIO   VIDEO   BEST OF   EVENTS   TRAFFIC   WEATHER   CONTESTS   TRAVEL   AUTOS

Local   Investigative   Politics   Business   Health   Consumer   Entertainment   National   World   Photos


ROCK ON AT OUR ROCK AUCTION!
CHECKOUT THE AUCTION ITEMS NOW

## 2 Teens Shot By Police In Roseland

December 22, 2013 5:50 PM

Filed Under: Chicago, Independent Police Review Authority, Police-Involved Shooting, Roseland



(CBS)

**LISTEN LIVE**

**FOLLOW US ON**

Sign Up for Newsletters

**CHICAGO (STMW)** — Two teenage boys were shot Sunday evening in the Roseland neighborhood when Chicago Police opened fire on a stolen car packed full of joyriders.

About 5 p.m., police pulled over a speeding stolen car near 95th and La Salle, according to a statement from the News Affairs office.

After the car stopped, the driver got out of the car and ran away, according to the statement. As more officers arrived at the scene, a passenger in the stolen vehicle moved into the driver's seat and put the vehicle in reverse.

Fearing that people in the car could face harm, an officer discharged his weapon, striking two teenage boys inside the vehicle. They were placed into custody and taken to Advocate Christ Medical Center. No officers

**Sponsored Content**    Recommended by


Why Amy Grant Doesn't Believe In God Anymore
News N Buzz


What Morgan Fairchild Looks Like Now Is Crazy
Sportingz


Mama June Lost 100lbs and Actually Looks Gorgeous!
Look.Damn.Good.

GJ-EXH_001-000019

were injured during this incident. A weapon was recovered from the scene.

Fraternal Order of Police spokesman Pat Camden's narrative of the incident was different from the News Affairs statement. He said there were seven people in the car, and after the car stopped, a passenger got out through the rear driver's side door. The driver backed up and hit the passenger. Officers then began walking up to the car, telling the driver to stop, but the car began to pull away, dragging the passenger, Camden said.

Concerned with the safety of the person being dragged, officers opened fire on the car, striking two teens inside. Camden said the teens' injuries were not thought to be life-threatening. Camden also said a replica weapon was found in the vehicle.

At the scene, a large crowd gathered while the sedan sat about half a block north of 95th on La Salle with its front end up against a light pole and the passenger doors wide open. Evidence markers littered the street.

Sandra Collins said at the scene that police shot her son, who is a student at Kennedy King College.

"I'm not saying my son was the best, but he was the best to me, and the police shot him down in cold blood," she said. "My tears are so dried up."

Her daughter Gabriella Collins, 28, said she and her mother had tried in vain to get information from police.

"Where's the answers? They're hurrying up to get their stories straight," Gabriella Collins said, expressing frustration with police.

"Someone needs to explain. Somebody shot my brother," she said. "Where's my brother? Where's my brother?"

A boy, who Sandra Collins said was her youngest son, was handcuffed and detained by police after a heated confrontation between the family and officers at the scene.

The Independent Police Review Authority is investigating the shooting. The officers were not hurt.

*(Source: Sun-Times Media Wire © Chicago Sun-Times 2013. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.)*



### MORE NEWS


7 Killed, 47 Wounded In Weekend Shootings Across Chicago


Peanut Tillman, Golden Knights, Thunderbirds Top Air And Water Show Day 2


Donald Trump: Chicago Could Stop Violence 'In One Week'

Powered by CBS



SPONSORED CONTENT
**Don't burn your hands on a hot steering wheel this summer. Try this quick tip next time you park.**
Learn a super-simple trick for keeping your steering wheel cool on hot days with a quick how-to from Design & Home
Ad by Bank of America