UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 16 CR 590 |
| v. | ) | |
| | ) | Judge Gary Feinerman |
| MARCO PROANO | ) | |

**GOVERNMENT'S SUPPLEMENTAL FILING IN SUPPORT OF ITS
RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

# EXHIBIT B

IN RE:   GRAND JURY    )    GRAND JURY NO.

          INVESTIGATION  )     15 GJ 327


BEFORE THE FEDERAL GRAND JURY

(Special August 2015 Grand Jury)


February 4, 2016

11:00 a.m.


PRESENT:

THE HONORABLE ZACHARY T. FARDON
United States Attorney, by
MS. GEORGIA N. ALEXAKIS
MS. ERIKA L. CSICSILA
Assistant United States Attorneys
Chicago, Illinois


(The Grand Jury, having convened

at 11:00 a.m. on the 4th day of

February 2016, pursuant to

adjournment, met in closed session

and the following proceedings were

had herein.)

KEN FLAHERTY,

having entered the Grand Jury Room, was sworn by the

Foreperson as follows:

   THE FOREPERSON:  Do you

   solemnly swear or affirm that the

   testimony you're about to give is

   the truth, the whole truth, and

   nothing but the truth, so help you

   God?

   THE WITNESS:  Yes, I do.

   THE FOREPERSON:  Please be

   seated.

   (Whereupon, the witness was

   sworn.)

   EXAMINATION

BY MS. ALEXAKIS:

 Q Could you please state and spell your name,

for the record?

 A My name is Ken, K-e-n, Flaherty,

F-l-a-h-e-r-t-y.

 Q You received a subpoena to testify before the

Grand Jury today, correct?

 A Yes, I did.

 Q Before we begin, I want to make sure you

KEN FLAHERTY                                    3

understand your constitutional rights with respect to

this proceeding.  You understand that this Grand Jury

is conducting an investigation concerning possible

violations of federal criminal law, correct?

    A    Yes.

    Q    You understand that these proceedings are

being taken down by the court reporter sitting in

front of you, correct?

    A    Yes.

    Q    You understand that you're under oath,

correct?

    A    Yes.

    Q    And you understand that you are free to

retain counsel before testifying today, correct?

    A    Yes.

    Q    You, in fact, did retain an attorney,

William Fahy, correct?

    A    Yes.

    Q    And Mr. Fahy isn't in the room with you right

now, but he's waiting outside, correct?

    A    Yes.

    Q    Now, you understand that the Grand Jury will

give you a reasonable opportunity to consult with

Mr. Fahy if at any point you'd like to do that while

KEN FLAHERTY                              4

you're testifying today, correct?

    A    Yes.

    Q    You understand that you may refuse to make
any statements, if a truthful answer to the question
would tend to incriminate you, correct?

    A    What was that question?  I'm sorry.

    Q    You understand that you can refuse to answer
any of my questions, if answering truthfully would
tend to incriminate you?

    A    Yes.

    Q    You understand that if you do make
statements, they can be used by the Grand Jury in
later legal proceedings against you, correct?

    A    Yes.

    Q    You understand that you can be prosecuted for
perjury, making false statements and obstruction of
justice, if you don't testify truthfully today,
correct?

    A    Yes.

    Q    And you understand that those crimes are
felonies that are punishable by up to five years in
prison, correct?

    A    Yes.

    Q    Officer Flaherty, where do you currently

KEN FLAHERTY                                    5

work?

A       I work for the Chicago Police Department.
I'm assigned to the 8th District.

Q       And how long have you worked for the Chicago
Police Department?

A       Eleven years.

Q       Now, the night of December 22nd, 2013, were
you working for the Chicago Police Department then?

A       Yes, I was.

Q       And what was your assignment that night?

A       I was assigned to a rapid response to a car
in the 6th District.

Q       Where is the 6th District generally?

A       On the south side of Chicago.  It's roughly
between 7500 and 9500 south between Damon and Cottage
Grove.

Q       And your partner that day was Officer
Jonathan Morlock; is that right?

A       That is correct.

Q       And Officer Morlock at that time was your
regularly-assigned partner, correct?

A       Yes.

Q       How long had the two of you been partners
approximately?

KEN FLAHERTY                                    6

A     A couple months, two or three months, I
believe.

Q     You and Officer Morlock were patrolling in
the area, correct?

A     Correct.

Q     You were in uniform?

A     Yes, we were.

Q     You were in a marked squad car, correct?

A     Correct.

Q     You were driving that car, correct?

A     I was.

Q     And that makes Officer Morlock the passenger,
correct?

A     Correct.

Q     At some point during your shift, you were
near the intersection or at the intersection of 95th
and LaSalle, correct?

A     Yes.

Q     You were driving westbound on 95th, correct?

A     Yes.

Q     You saw a vehicle come out of the alley that
runs parallel to 95th, correct?

A     Yes.

Q     And that vehicle was a Toyota, correct?

KEN FLAHERTY                                   7

A     Yes.

Q     The Toyota was moving at a pretty high rate
of speed, correct?

A     Yes.

Q     Now, you remember the Toyota turning
southbound on LaSalle, correct?

A     Correct.

Q     And at that point, did you and Officer
Morlock turn northbound onto LaSalle?

A     Yes.

Q     So your two vehicles ended up facing each
other, correct?

A     That is correct.

Q     At some point did you activate your squad
car's emergency lights?

A     I did.

Q     And when was that?

A     When I first came to the initial stop, I put
on my spotlight.  I illuminated the inside of the
vehicle to try to see who was driving, who was in the
car.  After I did that, I put the lights on, the blue
lights on top of the car.

Q     And what did you see when you illuminated the
inside of the vehicle?

A     That the vehicle was filled.  There was two
males in the front two seats, one behind the driver's
wheel, one on the passenger side, and the backseat
was filled multiple times with what appeared to be
youthful-looking juveniles.

Q     Approximately how many in the backseat?

A     There was four, maybe even five.  I'm not 100
percent sure.

Q     What happened shortly after your squad car
encountered this Toyota?

A     As soon as I turned on the blue lights?

Q     Yes.

A     All right.  As soon as I turned on the blue
lights, the driver of the Toyota that we were looking
at opened the driver's side door and he fled on foot.
He ran eastbound on foot.

Q     And did you later learn the name of the
driver of the Toyota was Delton ▮▮▮▮?

A     Yes, I did.

Q     What did your partner, Jonathan Morlock, do
in response to that?

A     He exited our vehicle and he gave chase on
foot.

Q     Did you call out anything over the radio

KEN FLAHERTY                                    9

dispatch at that time?

A     I did.

Q     What did you call out?

A     I believe exactly what I said was, "My
partner is in a foot pursuit, he's chasing after a
guy that's bailed from a stolen car."

Q     Did you know that the Toyota was stolen at
the time?

A     No, I did not.

Q     Why did you say stolen car then?

A     It was a hunch kind of, a good estimated
guess.  Also, when you're in a foot pursuit,
sometimes the dispatcher will be asking what are you
chasing them for, what are you chasing them for.  I
believe it's more important to know where he's at,
where he's going.  I gave the reason as a stolen car.
It could have been multiple things, but I just said a
stolen car.

Q     What was your hunch based on?

A     The age of the car filled with youths, all
youthful individuals, and as soon as I turned on the
lights the door opened and the driver ran.

Q     When you say youthful, do you mean too young
to have a driver's license?

A    It's possible.

Q    Now, you understand that there is a video from that night, correct?

A    Correct.

Q    And the video was taken from a camera that was mounted on the dashboard of a second police car that showed up at that scene at 95th and LaSalle that evening, correct?

A    Correct.

Q    That car with the camera in it was being -- the two officers that were in that car were Officers Marco Proano and Guy Habiak, correct?

A    Correct.

Q    Did your car have a dashboard camera, a dash cam in it?

A    No, it didn't.

Q    Why not?

A    The vehicle I was driving that night was never equipped with one.  I don't know if it was an older vehicle, one not generally used all the time, but that vehicle didn't -- was never installed to have a camera.

Q    So I'm showing the video right now and I've started the video from the beginning, you see the

timestamp that has 5:07:35.  I'm going to fast

forward a little bit to 5:09:20.  I wish there was a

more precise way for me to do this.

(VIDEO PLAYED)

Q    Okay.  So we're now stopped on the video at

the timestamp of 5:09:20.  Do you see that, Officer

Flaherty?

A    Yes, I do.

Q    Can you generally describe for the Grand

Jurors what is being depicted on the screen?

A    That's the vehicle I was driving, that's the

Toyota right to the right-hand side of the vehicle.

When the driver fled on foot, he left the car in

drive.  The car rolled and it got wedged in between

my squad car and a parked vehicle, which is on the

very far right of the screen.

Q    And the Toyota is the vehicle that's

essentially --

A    With the headlights on facing us, correct.

Q    Right.  And then right next to it, to the

right of it you can see the parked car or a little

bit of the parked car, correct?

A    Correct.  It's a parked unoccupied vehicle.

Q    And what you're seeing on the screen right

now, does that essentially match what you remember
from that night?

    A    Yes.

    Q    Now, after the Toyota came to this position
where it was between your squad car and this parked
car, do you remember the front seat passenger of the
Toyota trying to exit the Toyota?

    A    I do.

    Q    And did you later learn that the name of that
passenger was Jaquon, J-a-q-u-o-n, ███?

    A    Yes.

    Q    Now, was Mr. ███ able to exit the Toyota?

    A    Yes.

    Q    Was he able to leave the scene all together?

    A    No, he was not.

    Q    Why not?

    A    I'm still not sure to this day how it
happened, but when he exited the vehicle he got
completely out of the car.  The car was rolling and
he somehow became trapped or wedged or stuck in
between the Toyota he just exited and my squad car,
which was parked.  His lower legs were stuck in
between my front quarter panel and like the door.  I
don't know if he got caught on the door or what

happened when he exited, but the car -- he got stuck
in between the two vehicles.

Q     Did you hear Mr. ███ say anything at that
time?

A     Yes, I did.

Q     What did you hear him say?

A     He said, "Get me out, I'm stuck, I'm stuck,
get me out."

Q     And what did you say in response?

A     I assured him, I reassured him as soon as I
had other officers with me, I would get the car off
of him.

Q     Did you issue any verbal commands to any of
the other passengers in the Toyota?

A     I did.

Q     What kind of verbal commands?

A     Stay still, let me see your hands, stop
moving, stay in the vehicle.  I was shouting multiple
different verbal commands to them.

Q     Why were you doing that?

A     I was the only officer on scene.  There was
four, maybe even five people I was dealing with.  I
wanted to be safe, I didn't want to get hurt, I
wanted everyone just to stay still until I had other

vehicles or other people with me.

Q     So where were you positioned when you were initially issuing these verbal commands?

A     I was standing right in the front of my squad car, maybe an arm length away from Mr. ███████ who was stuck in between the two vehicles.

Q     Now, at some point did you move to the driver's side of the vehicle of the Toyota?

A     I did.

Q     And why did you do that?

A     The person sitted behind -- seating -- or sitted --

GRAND JUROR:  Sitting.

A     Sitting.  The person sitting behind the driver's unoccupied seat now, because the driver fled, he opened that back driver's side door and, in my opinion, he was attempting to exit and flee.  So I ran around the back of the vehicle and I shouted at him, "Shut the door, stay in the vehicle, let me see your hands."  I don't recall if he was the one that shut the door or I shut the door, but the door was shut and then I went back around to where Mr. ███████ was stuck.

Q     Now, at some point did Officers Proano and

Habiak arrive at the scene?

A     Yes, they did.

Q     How soon after you arrived at the scene did Officer Proano and Officer Habiak arrive there?

A     I would take a guess in between 30 to 45 seconds.  It was under a minute.

Q     And were they also in uniform?

A     Yes, they were.

Q     And they were also in a marked squad car?

A     Yes.  They were in one of the SUVs, a Tahoe, I believe it is.

Q     Had you ever worked with either of these officers before?

A     I have.

Q     To what extent?

A     As being their partner, a handful of times maybe each.  Officer Proano I probably worked with, I'm just guessing, as a partner maybe four or five times and same with Officer Habiak.

Q     When you say four or five times, do you mean four or five nights or shifts?

A     Shifts, tours of duty, four or five nights.

Q     And Officer Habiak, you had worked with him about the same number of times?

A    Correct.

Q    Did you have any other prior experience with Officer Habiak?

A    Yes.

Q    What was that?

A    I graduated the police academy with Officer Habiak.

Q    Now, Officers Proano and Habiak got out of their vehicle after they arrived at the scene, correct?

A    Yes.

Q    Do you remember that?

A    Do I remember it?  Yes.

Q    Do you remember Officer Habiak positioning himself behind you and to the left?

A    Yes, he was standing behind me to my left-hand side.

Q    Do you remember if Officer Habiak gave any verbal commands?

A    Yes.  I heard Officer Habiak shouting verbal commands, the same ones I was shouting, "Stay still, let me see your hands, don't move, stay in the vehicle."  I was shouting as he was shouting.

Q    Do you remember generally where Officer

Proano was positioned after he got out of the
vehicle?

    A    I never saw him get out of the vehicle, but
he was back behind me to my left behind where
Officer Habiak was standing.  He was even farther
back.

    Q    And when you say that you never saw him get
out of the vehicle, what do you mean by that?

    A    I never saw him or Officer Habiak -- I did
not -- I was unaware that they pulled up.  I was
unaware that they even got out of their vehicle until
I heard Officer Habiak shouting commands.  I didn't
see either one of them get out of their vehicle.

    Q    How is that possible that you didn't see them
when you're essentially at the same scene?

    A    My attention was at Mr. ████.  He was an
arm's length away from me.  He was pushing on the
vehicles trying to free his legs.  I wanted to make
sure that he wasn't going to get out and run.  I was
also looking at the vehicle I was standing right next
to.  There was four, maybe five people in there and
they were all fidgeting around, moving around.  My
attention was on that.

    Q    Did you at any point hear Officer Proano

issue any verbal commands to the passengers of the
Toyota?

A     I did not hear him.

Q     Now, at some point the Toyota starts to
reverse, correct?

A     Correct.

Q     And how did that happen?

A     There was a person who was seated -- again.

Q     Sitting?

A     Sitting, thank you.  There was a person that
was sitting in the backseat of the vehicle.  He
lunged forward -- his feet stayed in the backseat,
but he jumped forward in between the two front seats
with his body and then with his hand was reaching
down and was pushing the gas pedal.  So his feet were
still in the backseat, his body was in between the
two front seats and his head might have been like on
the driver's side seat and he was reaching the gas
pedal with his hands.

Q     But he wasn't actually sitting in the
driver's seat, correct?

A     No, he was not.

Q     And part of him, it sounds like, was maybe
under the dashboard; is that right?

A    Yes, he was reaching the gas pedal with his hands.

Q    And this particular passenger, did you later learn that his name was Delquantis, D-e-l-q-u-a-n-t-i-s, █████?

A    Yes, I did.

Q    So then the Toyota began to reverse?

A    Well, first it was still in drive, I believe, because it was wedged.  When the initial driver bailed, he left it in drive.  So he hit the gas pedal and you could hear the engine rev.  It was really high revving.  I think he had it to the floor and it wasn't going anywhere because the car was wedged. Somehow he did get it into reverse and then, yes, he managed to put the car in reverse and it peeled away at a pretty good rate backwards.

Q    Now, as the Toyota began to reverse, what happened to Jaquon █████?

A    His legs became unstuck and now he was free. Again, I was about an arm length away from him.

Q    As Jaquon █████ was freed from this stuck position that he was in, did a gun fall to the street?

A    Yes, it did.

Q    And what did the gun look like to you?

A    It was a large black revolver.

Q    Did it, in fact, turn out to be a BB gun?

A    It did.

Q    When the gun hit the street, how loudly did
it hit the street?

A    The BB gun was steel, so it was a steel
object hitting the ground.  I was standing right
there, I heard it.  I didn't see it fall, I don't
know if it fell from his waist pocket.  I don't know
where it fell from, I heard it, and I looked down and
I was able to see it was a gun and right away I went
to grab Mr. ███████.

Q    When you heard it, you were standing close to
the gun, correct?

A    Correct.

Q    And you said that the -- was the engine still
revving or the tires still -- or was the engine still
revving at that time?

A    Yes, the car just started going in reverse.

Q    Did you announce gun, did you shout that out?

A    I did not, no.

Q    Why not?

A    It just didn't happen.  At that incident --

instance, I wanted to grab Mr. ███ to make sure he didn't flee on foot.

Q    Officer Habiak is the one who actually picked up the gun from the street, correct?

A    Correct.

Q    And he handed it to you, right?

A    He did.

Q    And you put the gun in the pocket of the -- you were wearing cargo pants and you put it in your pocket; is that right?

A    That is correct.

Q    You don't remember Officer Habiak shouting gun, correct?

A    No.  He didn't shout it, but I heard him clearly state, "Gun, here's the gun, here's the gun." And he handed me the gun.

Q    And he said those words to you, correct?

A    Something -- something, yeah.  "Gun, here's the gun, here's the gun."  I don't exactly recall the terminology, but it was something to that effect.

Q    But he wasn't shouting it?

A    No.

Q    And you don't remember any of the -- well, the passengers in the Toyota, you don't remember any

of them using that gun or any other gun to shoot at
you or any of the other officers on the scene,
correct?

    A    Correct.

    Q    So I'm going to continue playing the video
and get us a few more seconds ahead.

               (VIDEO PLAYED)

    Q    Okay.  So I've stopped the video now at
5:09:26.  That's the timestamp, correct, Officer
Flaherty?

    A    Correct.

    Q    And again, we're looking at the scene from
the vantage point of Officer Proano and Officer
Habiak's car, correct?

    A    Correct.

    Q    And what you see on the screen right now is
another car, correct?

    A    Yes.

    Q    It's not the Toyota, correct?

    A    No.

    Q    Do you remember seeing that car on the scene?

    A    I don't recall seeing that car on the scene.
In obviously watching the tape I see it now, but at
the time of the incident, no, I don't recall that car

at all.

    Q    So I'm going to keep playing for a few more
seconds.

(VIDEO PLAYED)

    Q    Okay.  So I've now stopped the video, the
timestamp on it is 5:09:32.  Do you see that,
Officer Flaherty?

    A    I do.

    Q    So the car that we were just discussing, it's
now -- according to the video, it's now reversed,
correct?

    A    It goes in reverse right around this time.  I
don't know if it's in reverse at this moment or not.

    Q    But based on what you've just seen in the
video --

    A    Oh, you're talking about that car going down
the street?

    Q    Yes.

    A    I thought you were talking about the Toyota.
Yes, that car is in reverse.

    Q    Again, you don't remember this third car?

    A    No.

    Q    You don't remember seeing it on the scene?

    A    I do not recall.

Q      Now, the individual that you're seeing on the video, that's Officer Proano, correct?

A      That is correct.

Q      And his gun is drawn, correct?

A      Correct.

Q      And he's holding it sideways, correct?

A      Correct.

Q      You can't see the Toyota in the frame right now, correct?

A      Correct.

Q      But does it appear to you that he's pointing it in the Toyota's direction?

A      Yes, it does.

Q      And do you have -- separate from this video, do you have any independent recollection from that night of Officer Proano pointing the gun at the Toyota at this time?

A      No, I do not.

Q      Did you hear Officer Proano issue any verbal commands just before drawing his weapon?

A      I did not, no.

Q      You hadn't drawn your gun by this point in the incident, correct?

A      I'm pretty sure I did not draw my gun at all.

Q     At all that night?

A     At all.  I'm pretty sure I never drew my gun.

Q     And as far as you know, Officer Habiak didn't draw his gun either that night?

A     I don't know if he did or didn't.

Q     You don't know either way?

A     I don't know either way.

Q     Okay.  So I'm going to keep playing the video.

                    (VIDEO PLAYED)

Q     I have now stopped the video.  The timestamp on the screen is 5:09:39 p.m.  Do you see that, Officer Flaherty?

A     I do.

Q     Okay.  So at this point the Toyota has continued to reverse down LaSalle, correct?

A     Correct.

Q     And there are no officers in the Toyota's path, correct, as it's reversing?

A     Correct.

Q     And there's no one else, no civilians in the Toyota's path, correct?

A     Correct.

Q     But you can see Officer Proano shooting at

the Toyota, correct?

A    Yes.

Q    And at this point in the video it looks like
Officer Proano has fired multiple shots at the
Toyota, correct?

A    I believe so, yes.

Q    And, again, you're describing what you see on
this video, but what do you separately or
independently remember from that night?

A    I remember it was extremely quick.  The
whole -- once the car started going in reverse, I
heard the gun, I grabbed Mr. ████, I heard the
shots, I looked over, I was able to see quickly
Officer Proano discharging his firearm.  I was
placing Mr. ████ in custody and it was over and done
with in a matter of seconds.

Q    You yourself never -- you said you don't
remember drawing your gun that night, correct?

A    I don't remember drawing my gun at all.

Q    So you never shot at the Toyota, correct?

A    I did not.

Q    And as far as you know, Officer Habiak never
shot at the Toyota either, correct?

A    He did not.

Q    Do you remember whether Officer Proano tried to coordinate with you in some way, sort of signal to you in any way that he was about to start shooting at the Toyota before he did that?

A    I did not see him or hear him.  So if he tried, I was unaware of it.

Q    Okay.  So I want to rewind the video a little bit so we can talk about one aspect of the incident.

                    (VIDEO PLAYED)

Q    I have stopped the video.  There unfortunately isn't a good timestamp that I can associate with it, but essentially the Toyota has started to reverse and then do you see sort of a white sort of spec or blob hanging out from the top of the Toyota on the screen?

A    I do.

Q    Okay.  Do you have an understanding at this time of what that white spec on the screen is, what that white circle is?

A    I do.

Q    What is that?

A    One of the rear seated passengers is either hanging out of the vehicle or getting dragged by the door of the vehicle.  I'm unaware, but that's one of

the backseat passengers.

Q    When you say hanging out of the vehicle, you
mean that's the upper half of his body you can see
over the Toyota?

A    Correct.  You can see his shoulder, his side.
At a different -- I think you can see his shoulders a
little better and his head and his neck above the
roof of the car.

Q    And did you later learn that this passenger's
name was Kevon, K-e-v-o-n, ██████?

A    Yes, I did.

Q    Do you remember seeing Kevon ██████ in this
position that night?

A    I don't remember if I did that night or
because I saw the video.  I believe I saw it for a
split second at the time of the incident, but the car
started going backwards.  My attention was on the
gentleman standing right next to me.

Q    Do you remember whether Kevon ██████ that
night said something to the effect of that he was
being -- that he was stuck or that he was being
dragged by the Toyota?

A    I don't remember hearing him.

Q    Did you that night perceive Mr. ██████ as

being dragged by the Toyota?

    A    At the time of the incident?

    Q    Yes.

    A    Yes.  If he was hanging out of the vehicle, for a split second I do perceive him to be hanging out of the vehicle when it was going in reverse.

    Q    But do you remember that night thinking, "Oh, Kevon ▇▇▇ is in danger"?

    A    I don't remember thinking that at the time, but if he was hanging out of the vehicle when it was going in reverse, I don't remember at the time.

    Q    Okay.  So I'm going to keep playing the video for a few more seconds.

                  (VIDEO PLAYED)

    Q    And I have now stopped the video.  The timestamp on the screen is 5:09:45.  Do you see that, Officer Flaherty?

    A    I do.

    Q    So the Toyota has continued reversing down LaSalle Avenue, correct?

    A    Correct.

    Q    And then at some point it started to roll forward, correct?

    A    Correct.

KEN FLAHERTY                              30

Q     And it comes to a stop when it appears that
it runs into this light pole, correct?

A     Correct.

Q     And as the Toyota is taking this path
reversing and then going forward, Officer Proano is
still shooting at the vehicle, correct?

A     It does appear, yes.

Q     Do you have any -- apart from what you've
already described seeing on the video, do you have a
separate memory of what happened that night?

A     No, I do not.

Q     All right.  So I'm going to keep playing the
video for a little bit.

                    (VIDEO PLAYED)

Q     Okay.  So I have now stopped the video and
the timestamp is 5:10:35.  Do you see that, Officer
Flaherty?

A     I do.

Q     Can you generally describe what has been
going on over the last, I guess, 45 seconds or so of
the video?

A     Other officers were arriving, we're in the
process of getting people out of the vehicle, the
Toyota.

KEN FLAHERTY                                    31

Q      And did you find out around this time that
two of the passengers of the Toyota had been shot?

A      Yes.

Q      One of the passengers that was shot was
Delquantis ████, correct?

A      Correct.

Q      And that's the individual who was driving the
car using his hands on the gas pedal, correct?

A      Correct.

Q      And the other passenger who was shot was
David ████████████████ correct?

A      Correct.

Q      As far as you know, Kevon ██████ had not been
injured, correct?

A      Correct.

Q      And around this time your partner, Officer
Morlock, returned to the scene, correct?

A      He did.

Q      Because he had been chasing Delton ██████
correct?

A      Correct.

Q      Now, that night you never discussed what you
saw with Officer Proano, correct?

A      Correct.

Q      And you never asked Officer Proano why he
shot at the Toyota, correct?

A      Correct.

Q      You didn't ask him that night, right?

A      I did not.

Q      And you haven't asked him since then,
correct?

A      I have not.

Q      You didn't discuss the shooting or the
reasons for the shooting with any of the other
officers -- well, Officer Habiak, for example, on the
scene that night?

A      No.

Q      And why is that?

A      It's my understanding that when you're
involved in a police-involved shooting, we're not
supposed to talk to each other.  I know when the
detectives came they kept us separated.  I was in one
car and my partner was in another car.  I don't even
know exactly where Officer Morlock -- or Officer
Proano or Habiak were, but they keep us separated.
They don't want us talking to each other.

Q      To the extent that you know, do you know why
there's that practice in place?

A     I believe it's the same when you have four or
five individuals that -- you know, you want to keep
them separated so they all have their own
recollection of what happened.  If you get them all
together, we can talk, you can talk and everyone's
going to have the same story.  So this way it's going
to be everyone's own recollection of what they recall
themselves.

Q     Despite the fact that you didn't talk to
Officer Proano, did you at some point that night
learn that one of the reasons why he shot into the
Toyota is because he thought that that passenger in
the rear, Kevon ███████, was in danger of being
dragged?

A     Yes, I did.

Q     You filled out a couple of arrest reports
related to this incident, correct?

A     Yes, I did.

Q     One of those arrest reports I've marked as
Grand Jury Exhibit Delquantis ██████ Arrest Report.
Do you have that in front of you?

A     I do.

Q     And then the second arrest report I've marked
as Grand Jury Exhibit ██████ Arrest Report, correct?

A    Correct.

Q    So the ███████ Arrest Report has to do with Jaquon ██████, correct?

A    Correct.

Q    Now, generally speaking, with arrest reports -- well, before I ask that question:  Did you fill out these arrest reports?

A    I did.

Q    Generally speaking, when you fill out arrest reports, do you fill them out based solely on your own information of what happened that night?

A    No.

Q    So you'll talk to other officers who were on the scene before writing the report, correct?

A    Correct.

Q    So starting with Grand Jury Exhibit ████████ Arrest Report, the Jaquon ███████ Arrest Report, do you see on page 2 there is a section called Indictment Incident Narrative?

A    Yes.

Q    And is there anything in that paragraph or anywhere else in the report that explains why Officer Proano fired shots at the Toyota that night?

A    No, it does not.

KEN FLAHERTY                                      35

Q     So setting aside that arrest report, if you
could turn to the Delton ███ Arrest Report and I'll
direct your attention to the top of page 3 of that
report where there is a paragraph that's an incident
narrative, do you see that?

A     I do.

Q     And then a couple of lines into the incident
narrative -- well, actually, starting at the top of
the incident narrative it reads, "In summary above,"
meaning Delquantis ███, "was a backseat passenger
in a vehicle stopped for a traffic violation.  During
the traffic stop, the driver fled the car on foot at
which time the above subject," and again, that's a
reference to Delquantis ███, "jumped into the
driver's seat and sped away in reverse.  As the car
fled in reverse, the victim, ███, and that's a
reference to Kevon ███, was hanging out of the
vehicle and put in danger of being seriously hurt or
killed."  Do you see that, Officer Flaherty?

A     I do.

Q     I'd like to focus your attention on the
words, "The above subject jumped into the driver's
seat."  You testified before that Delquantis ███
did not actually ever end up sitting in the driver's

seat, correct?

    A    Correct.

    Q    Is that consistent with what you put in the arrest report?

    A    Yes, it's a summary. You don't want to make it a whole long thing. It's just a summary. He did -- technically only half of his body jumped into the driver's seat, but he jumped into the driver's seat to hit the pedals with his hands.

    Q    And now turning your attention to the last portion of the section of the incident narrative that I just read, "The victim ███ was hanging out of the vehicle and put in danger of being seriously hurt or killed." You testified that you really only saw Kevon ███ for it sounded like a fraction of a second, correct?

    A    Correct.

    Q    And that you didn't personally perceive ███ to be in danger as the incident was happening, correct?

    A    As the incident was happening, the split second I saw him I didn't even think -- I was -- my attention was on Mr. ███.

    Q    Okay. I'd like to show you one more

document.  You should have in front of you a document

that's been marked Grand Jury Exhibit CPD Event

Query.  Do you have that in front of you?

        A    I do.

        Q    And are you familiar with CPD Event Queries

generally?

        A    Yes, I am.

        Q    Can you describe what these documents are for

the Grand Jury?

        A    It's a transcript typed out of the radio

transmissions between us and our dispatchers.

        Q    So the Event Query that's in front of you is

the communications with the dispatcher that night of

December 22nd, 2013, correct?

        A    Correct.

        Q    Okay.  So I want to point out a few different

lines to you.  If you look about the fourth line down

on the event chronology, do you see an entry at

17:07:15, so 5:07 and 15 seconds that says, "Stolen

vehicle," correct?

        A    Correct.

        Q    And then the very next line at 5:07:24, so

nine seconds later, it says, "Shots fired," correct?

        A    Correct.

Q     And then at 5:07:50 it says, "Shots fired by the police," correct?

A     Correct.

Q     And then a little bit further down, maybe halfway down the page, there's a line that says at 17:09, so 5:09:26 about almost two minutes later, it says, "Weapon recovered," correct?

A     Correct.

Q     And then at 5:09:28 it says, "Gun recovered," correct?

A     Correct.

Q     You testified earlier that the shots were fired at essentially around the same time that the gun was recovered, correct?

A     Correct.

Q     But this Event Query -- based on the Event Query, it looks like the gun was recovered after the shots were fired, correct?

A     Correct.

Q     The times on the Event Query, do they accurately reflect when the events, the underlying events, actually took place?

A     No, they don't.

Q     Based on your experience, how do these

incidents get recorded on the Event Query?

     A     Well, the dispatcher has to type them in and

once she said shots fired by the police, there's

other vehicles saying I'm coming or she's notifying

people.  There's multiple things that she's doing as

fast as she could.  She or he.  Not all dispatchers

are shes.  So the dispatcher was doing multiple

different things and by the time she put it in, it

was, I guess, two minutes later.

     Q     Okay.  But essentially the sequence of events

on this Event Query isn't necessarily how it happened

in real-time?

     A     Correct.

                    MS. ALEXAKIS:  I have no

               further questions for Officer

               Flaherty at this time.  Do the

               Grand Jurors have any questions?

BY A GRAND JUROR:

     Q     Officer Flaherty, within the events evolving

in the video, you said your vehicle didn't have a

camera, correct?

     A     Correct.

     Q     And this other camera, is this Officer

Proano's vehicle?

A    Yes.

Q    Did you ever appear in this video?

A    I did.

Q    Did we see you there?

A    I did, but after -- if she goes back, I can
point myself out here right now.

Q    Not to this point though, right?

A    I'm in there now.  I'm standing right by the
vehicle with my back to the vehicle.  I have a black
skull cap on, actually.

BY MS. ALEXAKIS:

Q    This one (indicating)?

A    No, left.  That's me.

BY GRAND JUROR:

Q    My second question is:  Where would your
partner be that was chasing on foot within this?

A    You could see him come out of a backyard.
That white house on the right-hand side, he comes out
of that backyard and he has the driver in custody.

BY MS. ALEXAKIS:

Q    Is this the white house (indicating)?

A    That's the white house.  He comes out of that
backyard, but a little before this you could see him
walking out with the original driver, Mr. Delton

KEN FLAHERTY                              41

 .

BY GRAND JUROR:

   Q    And my final question is:  This alley or
whatever seems like a driveway where the vehicle
tried to exit --

                 MS. ALEXAKIS:  This one right
              here (indicating)?

                 GRAND JUROR:  Yeah, that one.

BY GRAND JUROR:

   Q    Is that the same one that they came out of
speeding?

   A    No.  It's the same alley, but the one on the
left-hand side -- it's an alley that runs
perpendicular -- or parallel to 95th Street.

   Q    So it's a continuation?

   A    It's a continuation.  He came out of the
alley on the west side of the street and now he's on
the alley kind of towards -- on the east side of the
street, but that's the alley he came out of.  The
officer standing on the far left, right past him,
that's the alley he came out of.  And when he came
out of that alley, there's a sidewalk, it's a street.
The car came cruising out.  It didn't slow down at
all and you have to -- it's a minor traffic

violation.

Q    Were you ever concerned that your partner
might be in the crossfire with Proano's bullets?

A    At that time I didn't know where my partner
was.  I was out of the direct path.  I didn't even
think about it until afterwards.

                    MS. ALEXAKIS:  Before we move

                    on to any other questions, I just

                    want to make clear, for the record,

                    that this last series of questions

                    and answers we've been pointing

                    to -- referring to the video at the

                    timestamp of 5:10:35.  Are there

                    any other questions for Officer

                    Flaherty?

BY ANOTHER GRAND JUROR:

Q    From the time you spotted the car pulling out
of the alley until about this time, what is that
timeframe?  Because I haven't been following the
timestamps.  Are we talking five minutes, ten
minutes, fifteen minutes?

A    From the first second I saw the car to right
there would be about three to four minutes, I
believe.  From the first time I saw the car when I

KEN FLAHERTY                                    43

called for a unit, it took Officer Proano and Habiak

less than a minute to get there.  They must have been

right around the corner.

          MS. ALEXAKIS:  I think the

          first timestamp I showed, for the

          record, was 5:09 and that was

          shortly after -- essentially right

          when Officer Proano and Habiak

          arrived at the scene.

          GRAND JUROR:  Okay.  Thank

          you.

          MS. ALEXAKIS:  Any other

          questions?

BY ANOTHER GRAND JUROR:

     Q    You heard the gun fall, but you didn't see it

fall out of the guy --

     A    ██████?

     Q    ██████?

     A    I was standing a foot away from him, but I

did not see where it fell from.  Once the car went in

reverse, it all -- it was quick, quick, quick, quick,

quick.  I heard it, I looked down, I saw it, I

grabbed him, I looked at the car.  Officer Proano was

starting to shoot, I looked over.  I mean, it was

real quick.  No, I did not see where the gun fell
from.

     MS. ALEXAKIS:  Any other
    questions?

BY ANOTHER GRAND JUROR:

 Q How are you trained to stop a car without a
driver in it?

 A We're not really trained on that.  I don't
know.  Get lucky.

BY ANOTHER GRAND JUROR:

 Q I mean, are there policies in place about how
to deal with moving vehicles?

BY MS. ALEXAKIS:

 Q To your knowledge?

 A Well, yes, there is a policy.  You're
supposed to, if you could, get out of the way of a
moving vehicle.  I don't know how you would stop a
car with no driver, but there was one pushing on the
gas pedal with his hands.  I mean, you could try to
stop him, I guess.

BY ANOTHER GRAND JUROR:

 Q When you testified that the other officer
said gun and you stated that you didn't pull your
revolver out, why is that?

A       He was talking about the gun that he
recovered.

Q       Okay.

A       The gun fell to the ground, I looked at it, I
saw the gun.  It was right by my feet, maybe a little
to my left.  I grabbed Mr. ███.  The gun fell off
his person somewhere and Officer Habiak said, "Gun,
gun, here's the gun," meaning the gun that just fell
to the ground.  He gave that gun to me and I put it
in my pocket.

Q       Why did he give it to you?

A       Because he wanted to go assist Officer Proano
with that vehicle.  I stayed with Mr. ███.  I had
the gun, it was in my custody then, I put it in my
pocket.  I stayed with Mr. ███ until other vehicles
and other officers showed up.

Q       Okay.  The individual who had his hands
supposedly on the gas pedal and the car is moving in
reverse, were there any shots fired from that
vehicle?

A       From the vehicle he was in?  At that time I
was unaware of, but as we sit here today, no, there
was no shots.

Q       Okay.  But you said you were unaware.  You

were right there.  You could hear gunshots?

     A     I did, yes.  I was able to look up briefly.
I saw Officer Proano firing his gun.

                    MS. ALEXAKIS:  You're asking

                    whether there were any shots fired

                    from the vehicle?

                    GRAND JUROR:  From the Toyota,

                    right.

BY MS. ALEXAKIS:

     Q     And you've testified that you didn't hear any
shots that night?

     A     At the time of that incident I was unaware
if they were -- I know Officer Proano was shooting.
Right when it was happening, I was unaware.  I did
not know at that second if they were shooting back.

     Q     And now you know?

     A     Now I know, yes, there was no shots ever
fired from that vehicle.

                    MS. ALEXAKIS:  Does that help,

                    sir?

     A     I did hear the shots, I looked up, I did see
Officer Proano for a brief second discharging his
firearm.  I was unaware at that second when it
happened.  I was unaware if they were shooting out of

the vehicle or not, but as we sit here today or a few
minutes afterwards I knew there was no shots fired
ever from that Toyota.

BY ANOTHER GRAND JUROR:

Q    To follow-up to his question:  When he asked
how you're trained to deal with, say, a car, you
know, that's moving in reverse obviously leaving a
scene and you said basically to get out of the way,
would it be ever in your training or just a gut
instinct to try and stop that car, say, by shooting
out its tires?

A    No, we're never allowed to shoot out tires.
It's not allowed, per our policy.

Q    Are you just supposed to let the car leave
then?

A    You could give chase on foot or in a vehicle,
yeah.  As long as your life's not in jeopardy or
anyone else's life is not in jeopardy, you could
probably just watch it go, but, I mean, that's not
our training.  We're supposed to go after it.

Q    On foot?

A    On foot or in a vehicle.  At that time I
wasn't in my vehicle, I had Mr. ███ in custody.
The gun fell out from him.  I don't know exactly when

I knew it was a BB gun.  It was a steel BB gun, but maybe when I grabbed it I knew it was a fake gun, but it happened so quick.  I cuffed him, I held him in custody until other vehicles arrived.

Q    But it would be acceptable -- let's say a different scenario happened here and that car was able to flee the scene.  That's -- as opposed to shooting out the tires, that's what you would have to do?

A    Well, again, we can't shoot out the tires.

Q    So if the car is faster than all the police officers on the scene and you can't catch it, you can't shoot out the tires, it just gets to leave the scene?

A    Correct.

Q    Okay.

A    And then -- then, you know, we would have to hopefully find the car because Officer Morlock had the driver.  I don't even know if I typed in the driver's license because we would have had a computer in our car.  I don't think I even typed in the driver's -- the license plates, I mean.  So I'm not even sure we would have had the license plate, if the car got away.

BY ANOTHER GRAND JUROR:

Q     Didn't you know that that was the car because it was a stolen car?

A     No, I was unaware at the time it was stolen. I took an educated guess just by the reaction of the driver and the youthful appearance of the driver. I figured it might be a stolen car, but, I mean, he could have possibly -- it could have been multiple reasons why he would have jumped out of the car and ran. I just took an educated guess and I assumed it was a stolen vehicle, but I was unaware for 100 percent certain. Obviously, something was wrong. He took off running, the driver. It could have been multiple reasons. I just took a guess it was a stolen vehicle.

BY ANOTHER GRAND JUROR:

Q     Officer Flaherty, I have another question. Now, Mr. ▇▇▇▇ he was the passenger in that Toyota, in the passenger seat; is that correct?

A     Front seat passenger, correct.

Q     And so -- and then you said he got lodged. So that meant he was trying to get out and escape perhaps?

A     He did exit his door when the car was rolling

forward and he completely got out of the car.  I
don't know if he got tripped up or the door caught
him or what happened, but he completely got out of
the car.  The door shut and then he got wedged in
between the door of the Toyota and the front quarter
panel of my squad car and just the bottom of his legs
and he was pushing on the car trying to free himself,
you know, and he was saying, "Get me out of here."
And I assured him as soon as somebody gets here, I'll
get you out of here.

    Q    Thank you.  I was just wondering about the
door shutting?

    A    The door did shut.  I believe the door was
shut 100 percent of the way and he was stuck in
between the door he just exited from and the front
quarter panel of my vehicle.

    Q    Because my question was:  If the Toyota went
in reverse and the door was still open, he would have
been caught by the door?

    A    If he was behind the door.  I think he was
right where the door was.  I'm not 100 percent sure
where he was wedged.  It was the front right side of
my car right by my front tire was where he was stuck.
On the Toyota, I believe it was around the front

door.  I don't know if it was behind the door, in front of the door, but the door was shut, I'm almost positive of it.

BY ANOTHER GRAND JUROR:

Q    One question:  You said that you were aware that Officer Proano discharged his weapon.  Can you explain to me what discharge means?  Does that mean emptying out his magazine?

A    Discharging is just shooting.  You discharge one bullet at a time when you pull the trigger.  I heard his shots, I looked up quickly and I was able to see Officer Proano shooting his gun.

Q    Do you recall how many shots?

A    Multiple shots.  No, I don't recall exact numbers, but multiple.

BY ANOTHER GRAND JUROR:

Q    You stated that when the car is going in reverse there's no policy to try and disable the tires and just let the vehicle leave the scene, is that what you said?

A    There is no policy saying let the car leave the scene.  There is a policy saying do not shoot out the tires.

Q    Okay.  But tires weren't shot and the car is

in reverse attempting to leave the scene, but Officer
Proano is shooting at the vehicle, correct?

A    Correct.

Q    So he doesn't want it to leave the scene?

A    I believe.  You'll have to ask --

Q    I'm asking -- I'm just saying from what we
see in the video, he does not want the car to leave
the scene because he keeps firing?

BY MS. ALEXAKIS:

Q    You can't say for sure what --

A    I can't say for sure what Officer Proano -- I
didn't see what he saw.  My attention was elsewhere.
He was shooting at the vehicle as it was going in
reverse.

BY ANOTHER GRAND JUROR:

Q    I have a couple.  Why can't you shoot the
tires?  You said there's a policy, but why?  What's
the reasoning behind that?

A    I do not know.  That's just the way we're
taught and trained.  We were told never to shoot at
tires.

                    MS. ALEXAKIS:  I believe

                    you'll be hearing from a witness

                    later on in our Grand Jury

presentation who is probably in a
better position to answer those
questions.

BY ANOTHER GRAND JUROR:

Q    When you are trained should you need to use
your weapon, how are you trained to shoot?  Is there
a standard on how you hold your weapon?

A    There was in the academy how you stand and
how you hold a weapon.  We were trained, yes.

Q    Because the video shows Officer Proano with
it turned like this (indicating).  Is that a
normal --

                    MS. ALEXAKIS:  When you say
                like this, you mean sideways?

                    GRAND JUROR:  Yeah, sideways.

A    We were not trained to hold the weapon like
that.

BY GRAND JUROR:

Q    For whatever reason, he opted to hold his gun
that way?

A    Yeah.  For reasons unknown, I don't know, but
no, we were not trained to hold the gun sideways.

                    MS. ALEXAKIS:  Ma'am, you said
                you had a couple questions?

BY ANOTHER GRAND JUROR:

Q     That other car, were you able -- were there
witnesses in that other car that showed up or were
you able to get a license plate with the dash cam of
that other car that showed up in there?

                    MS. ALEXAKIS:  And this is the
               other car --

                    GRAND JUROR:  Not the Toyota.

                    MS. ALEXAKIS:  -- you're
               referring to that you see
               reversing?

                    GRAND JUROR:  Right.

BY MS. ALEXAKIS:

Q     To the best of your knowledge, Officer
Flaherty, was -- well, presumably there was a driver
in that car?

A     To the best of my knowledge, it was one
female.  She wound up crashing down the block.  She
was issued a traffic accident and I never spoke with
her.  I don't know who she was, but she was on scene.

Q     And to the best of your knowledge, Officer
Flaherty, do you know if there are other detectives
or officers associated with CPD who did a broader
investigation into the incident?

A    Yes.

Q    So they might have talked to other witnesses
on the scene, not just you or other officers, but
maybe people in the neighborhood, other people who
just happened to be in the area?

A    Yes, there would be someone who does that.

BY ANOTHER GRAND JUROR:

Q    As we saw in the video at the end, even more
officers arrived on the scene and I assume they had a
squad car.  Was there video from that, I assume, a
third squad car arriving on the scene?

A    I would have to guess, but there should have
been other video from other squad cars, but I don't
even know -- on 95th Street right where this incident
happened, it's the border of our district and if you
cross the street on the other side of 95th Street,
it's a different district.  So they might have been
closer.  Some of those officers that responded, I
don't know who they were.  They must have came from
the other districts.  I did not have any chance -- I
don't know how to even look if there was other video.
I never saw any other video but that one.

BY MS. ALEXAKIS:

Q    Do you remember if those other officers,

these other units arrived before or after Officer
Proano had finished shooting?

A    No.  Officer Proano shooting, it was done
before anyone else arrived, but as you would see on
the tape, they arrived pretty quickly also.

BY ANOTHER GRAND JUROR:

Q    One last question:  Officer Morlock said that
he's in the 6th District and you stated you're in the
8th?

A    Correct, as of today.

Q    Why is that?

A    I transferred out.  My -- one of my old
partners right before me and Officer Morlock became
partners, he was promoted and he went to the 8th
District.  I went to the 8th District to work for my
old partner.  He's my boss now.

BY ANOTHER GRAND JUROR:

Q    So Mr. Proano, as soon as he got out of the
car, his cop car, he had his gun open right away.
Was there anything that was said over the radio that
would lead him to, you know, like just have guns
drawn like right away?

A    The only thing I said over the radio was,
"The driver of a vehicle bailed, my partner is on

foot pursuit after him, he bailed from a stolen car."
I don't recall saying anything else more than my
location and when he showed up maybe there was --
again, you would have to ask him, but there was still
four to five people in the vehicle and Mr. ████ who
was standing an arm length away from me, outside of
the vehicle standing.  His legs -- his arms weren't
caught, his legs were.  So you'll have to ask Officer
Proano why, but I would imagine just because there
was multiple people still in the vehicle.

     Q     Are there rules and regulations for when you
can draw your weapon at a scene?

     A     To my knowledge, no.  You can pull your gun
and have it ready any time you feel the need that you
might have to use it.

BY MS. ALEXAKIS:

     Q     But again, you hadn't pulled your weapon?

     A     To my knowledge, I don't think I -- the whole
incident I don't think I pulled my weapon out.

               MS. ALEXAKIS:  Are there any

               other questions for Officer

               Flaherty?  I'm not seeing any.  May

               the witness be excused?

               THE FOREPERSON:  Yes.  Thank

you very much for your testimony.

(WHEREUPON there being no
questions by the Grand Jurors, the
witness was excused.)

GJ-TRAN_003-000058

KEN FLAHERTY                    59

IN RE:    GRAND JURY        )      Case No.
          INVESTIGATION     )      15 GJ 327


C E R T I F I C A T E


    I, MELISSA A. HILL, CSR, do hereby certify
that I reported the proceedings had in the above
matter before the Federal Grand Jury in the Grand
Jury Room in the United States Court House at
Chicago, Illinois, on the 4th day of February, 2016,
and that the foregoing is a true and accurate
transcript of said proceedings.


Melissa A. Hill, CSR

2·18·16